# United States Court of Appeals
## For the First Circuit

No. 20-2175

CECILIA RAQUEL GOMEZ-ABREGO and K.R.H.G.,

Petitioners,

v.

MERRICK B. GARLAND,[*] ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Thompson and Kayatta, Circuit Judges,
and Katzmann, Judge.[**]

Thomas Stylianos, Jr. for petitioner.
Abigail E. Leach, Trial Attorney, Office of Immigration
Litigation, Civil Division, United States Department of Justice,
with whom Brian Boynton, Acting Assistant Attorney General, Civil
Division, and Anthony C. Payne, Assistant Director, Office of
Immigration Litigation, were on brief, for respondent.

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Attorney General
Merrick B. Garland has been substituted for former Attorney General
William P. Barr as the respondent.
[**] Of the United States Court of International Trade, sitting
by designation.

February 16, 2022

**THOMPSON, Circuit Judge.**  Petitioners, Cecelia Raquel Gomez-Abrego and her minor daughter[1] (referred to collectively as "Petitioner" or "Gomez-Abrego"), seek judicial review of a Board of Immigration Appeals ("BIA") opinion affirming an Immigration Judge's ("IJ") decision denying her asylum relief, withholding of removal under the Immigration and Nationality Act ("INA"), protection pursuant to the Convention Against Torture Act ("CAT"), and ordering her removed.  She claims the BIA erred in affirming the IJ's findings that: (1) she had not established that she suffered past persecution on account of a protected ground (here, membership in a particular social group); and (2) she was not entitled to protection under the CAT.  She also challenges the implementing regulations governing CAT protection, 8 C.F.R. § 1208.18, and contends that the BIA should have remanded the case to the IJ to consider an alternate formulation of her social group. Finally, Petitioner submitted a 28(j) letter arguing that the Supreme Court decision in <u>Niz-Chavez</u> v. <u>Garland</u>, 141 S. Ct. 1474 (2021) renders her Notice to Appear ("NTA") defective so that it failed to confer jurisdiction on the Immigration Court.

---

[1] Because the claims of Ms. Gomez-Abrego's minor daughter are dependent on her mother's, we will refer only to Ms. Gomez-Abrego throughout, unless specifically noted otherwise.

- 3 -

Given the record before us, we deny the petition for judicial review in part, and remand to the BIA for further consideration in accordance with our decision that follows.

**BACKGROUND**

*Life Prior to Arriving in the U.S.[2]*

Petitioner and her minor daughter are natives and citizens of El Salvador. During the proceedings at the Immigration Court, Gomez-Abrego testified about the difficulties of her life in El Salvador and the frightening experiences she and her daughter endured prior to arriving in America. Gomez-Abrego ran a small food business, and gang members would go to her store and ask her for "rent," or payment on a weekly basis. One day, armed gang members showed up at Gomez-Abrego's home finding her there with her young daughter. After barging in, they asked her for more money than what she had already been giving them. She implored she could not provide them with the amount of money they requested because her business did not produce the kind of money they were seeking. In response, the gang members told her that if she did not give them the money they demanded, they would kill her and her daughter. She testified that she believed these threats because gang members did not just threaten harm when people did not pay.

---

[2] The details of Gomez-Abrego's life in El Salvador are elicited from her testimony in front of the IJ at her removal hearing on October 24, 2018. The IJ found her testimony to be credible.

- 4 -

Rather, when they wanted something, they really wanted it and if they did not get it, they not only threatened to kill but did in fact kill people. When gang members saw that she (or anybody) was earning just a little bit of money, they wanted that person to start sponsoring them or give them money.

Gomez-Abrego testified that she never called the police or asked them to protect her because she believed the police in the area did not really do anything, but instead were "in cahoots" with the gang members. She believed that if someone told the police about the gang activity, that person would "get in trouble." When asked who that person would be in trouble with, Gomez-Abrego testified that the police were corrupt, so if you reported something to them, they generally got upset and, instead of helping, would do something to the individual reporting the trouble.

These are the reasons why she decided to enter the United States in search of work with her young daughter at or near Otay Mesa, California on or about March 1, 2016, without having been admitted or paroled after inspection by an immigration officer. Gomez-Abrego believed that if she and her daughter had to return to El Salvador, the gangs would probably kill her because the situation there was very dangerous. If the gangs did not kill her, they would likely extort her for money which would put her life in danger again. When asked what would happen to her daughter

if forced to go back, she believed that she, too, would also likely be killed.

Upon arriving in the United States in early March, agents of the Department of Homeland Security ("DHS") served Gomez-Abrego with an NTA which charged her with removability pursuant to INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), as a noncitizen present in the United States without having been admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General. Proceedings before the IJ commenced a few months later.

*IJ Hearing*

On November 2, 2016, Gomez-Abrego appeared before the IJ and admitted to all the charges in the NTA and conceded removability. Before the IJ, Petitioner timely filed applications seeking relief, including asylum, withholding of removal, and relief under the CAT. The IJ found Gomez-Abrego removable as charged and designated El Salvador as the country of removal should it become necessary. The hearing on her applications for relief did not occur until almost two years later on October 24, 2018.

At that hearing, the IJ asked Gomez-Abrego's counsel to state the particular social group for which she claimed persecution. Her attorney explained that, "[w]ith regard to [the] particular social group for the actions of the gangs, [Gomez-Abrego] would be a victim of gang violence and threats which the

police either actively collaborate with or ignore because of their affiliation with gang members." In support of her request for relief, Gomez-Abrego went on to testify about her life in El Salvador and the circumstances that caused her to flee to America. In addition to her own testimony, Petitioner submitted a 2015 State Department country condition report highlighting the violence in El Salvador relating to gangs and the police's ongoing struggle to manage the difficult situation. She also submitted letters from her mother-in-law and her sister-in-law, which reflected what life in El Salvador was like from their vantage point and which corroborated Gomez-Abrego's story of violence and fear. The letters also described the predominance of gangs in their community, and the "extortions and threats by . . . people who have no heart for anyone."

At the conclusion of the hearing, the IJ orally issued a decision denying Petitioner's applications for asylum, withholding of removal, and protection under the CAT. Even though the IJ found Gomez-Abrego credible and a victim of extortion and threats, with respect to asylum and withholding of removal, the IJ determined that she had not suffered past persecution or held a well-founded fear of future persecution. The IJ explained that, although taken in the aggregate, the harm Petitioner suffered could rise to the level of persecution, it was not persecution under the law because Gomez-Abrego failed to show it occurred on account of

- 7 -

race, religion, political opinion, nationality, or a particular social group of which she was a member. The social group she claimed to be a part of was not cognizable because it was not a social group that existed independently of the harm she suffered. The only harm she advanced at the hearing was on account of her particular social group, which the IJ already found did not meet the threshold requirements of a cognizable social group. Despite her credibility and the horrific situation Gomez-Abrego and her daughter had experienced in El Salvador, because she failed to establish eligibility for asylum, she likewise failed to establish eligibility for withholding of removal.

With respect to Gomez-Abrego's request for protection under the CAT, the IJ found that she failed to meet her burden of proof to show it was more likely than not that she would be tortured in El Salvador for any reason. Although she "was subjected to criminal harm and a terribly frightening experience . . . in the presence of her young daughter," she was unable to show that she was more likely than not to suffer torture in the future. Further, the IJ noted that although Gomez-Abrego testified that she believed the police would not protect her, and in fact calling them might make the situation even worse for her, the record "d[id] not support a finding of [police] acquiescence or turning a blind eye" to any torture Gomez-Abrego might experience. Similarly, she concluded the State Department 2015 country conditions report was

insufficient to meet the burden required under the CAT to show it was more likely than not that Petitioner would be tortured in the future with the acquiescence of the Salvadoran government.

*Appeal to BIA*

On November 16, 2020, the BIA dismissed Petitioner's timely filed appeal. The BIA found no clear error as to the IJ's factual findings in denying Petitioner's applications for asylum and withholding of removal and agreed that she failed to establish the harm she suffered and feared in El Salvador was on account of a particular social group or other protected basis. The BIA similarly found that Petitioner did not establish that it was more likely than not that she would be tortured by or with the acquiescence of the Salvadoran authorities.

**DISCUSSION**

Seeking review of the dismissal, Petitioner not only takes issue with the BIA's decision in affirming the IJ's findings, but also complains of additional errors. She claims the BIA erred in affirming the IJ's findings that: (1) she had not established that she suffered past persecution on account of a protected ground (here, membership in a particular social group); and (2) she was not entitled to protection under the CAT. Gomez-Abrego also challenges the implementing regulations governing CAT protection, specifically, 8 C.F.R. § 1208.18, and further contends that the BIA should have remanded her case to the IJ to consider an

- 9 -

alternate formulation of her social group. Finally, Petitioner submitted a 28(j) letter arguing that the Supreme Court decision in Niz-Chavez v. Garland, 141 S. Ct. at 1474 renders her NTA defective and fails to confer jurisdiction on the Immigration Court. After going over some standard of review principles, we will first address Gomez-Abrego's asylum claim (and additional argument regarding her social group), and then her CAT claim (and new argument regarding the CAT regulations). Her 28(j) letter will be our last point of discussion.

*Standard of Review*

Where, as here, "the BIA adopt[ed] portions of the IJ's findings while adding its own gloss" the court reviews the IJ's and the BIA's decisions as one. Martínez-Pérez v. Sessions, 897 F.3d 33, 39 (1st Cir. 2018) (quoting Paiz-Morales v. Lynch, 795 F.3d 238, 242 (1st Cir. 2015)); see also Ordonez-Quino v. Holder, 760 F.3d 80, 87 (1st Cir. 2014).

The court reviews the BIA's factual findings under the substantial evidence standard, "meaning we accept the findings 'as long as they are supported by reasonable, substantial and probative evidence on the record considered as a whole.'" Aguilar-De Guillen v. Sessions, 902 F.3d 28, 32 (1st Cir. 2018) (quoting Singh v. Holder, 750 F.3d 84, 86 (1st Cir. 2014)).

The BIA's conclusion regarding the definition and scope of the term "particular social group" is a legal determination

- 10 -

that is reviewed de novo.  Id. at 33.  That said, deference is given to the interpretation of the term "social group" formulated by the BIA "even if we conclude that the term is susceptible to more than one permissible interpretation."  Id. (citation omitted).

*Asylum Claim*

The court need not touch on all the specifics of Petitioner's asylum claim because on the record before the court, she fails to meet the threshold requirements for asylum relief, most notably persecution on account of a protected social group. To be eligible for asylum, a petitioner must establish that she is a refugee within the definition of the immigration laws.  To do so, she has the burden of demonstrating she cannot return to her home country because she has suffered persecution on account of a legally protected ground in one of two ways: (1) past persecution (which gives rise to a rebuttable presumption of future persecution); or (2) a well-founded fear of future persecution. See Aguilar-De Guillen, 902 F.3d at 33 (citing Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003)); 8 U.S.C. § 1158(b)(1); 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13.  The persecution must be on account of an enumerated ground -- "race, religion, nationality, membership in a particular social group, or political opinion." Olujoke v. Gonzáles, 411 F.3d 16, 21 (1st Cir. 2005) (quoting 8 U.S.C. § 1101(a)(42)(A)).  Gomez-Abrego maintains that she was

- 11 -

persecuted because of her membership in a particular social group. The BIA determined, and we agree, that the particular social group for which she claimed membership in front of the IJ ("victims of gang violence and threats which the police ignore or collaborate with because of their affiliation with gangs") does not aid her in establishing persecution (past or future) on account of that identity under the INA.

On appeal, Gomez-Abrego does not challenge that the purported particular social group for which she claimed membership is not legally cognizable. Switching horses, she argues the record evidence before us instead supports her membership in a different social group, in particular, Salvadoran female small business owners. Petitioner contends that "[s]uch a group shares a common characteristic, [is] defined with reasonable precision, is readily identified by persons in El Salvador, and is not defined by [the] persecution experienced by its members." While Gomez-Abrego did not argue in front of the IJ that it should consider this alternative social group, in her briefing before the BIA, she did argue that the BIA should remand her claims to the IJ to consider this alternative formulation. The BIA did not address her argument on this point. Given the BIA's failure to weigh in on this new social group formulation, we remand to the BIA for its consideration thereof. See Pina v. Mukasey, 542 F.3d 5, 12 n.7 (1st Cir. 2008) (finding that "the BIA did not address [an] issue,

- 12 -

and we may not conduct our own de novo inquiry") (citing <u>INS</u> v. <u>Orlando Ventura</u>, 537 U.S. 12, 16 (2002)).

*CAT Claim*

Gomez-Abrego argues that she is entitled to relief under the CAT because the BIA misapplied the "legal standard"[3] as to the definition of "torture" in assessing the likelihood of her being subjected to torture. For the reasons that follow, there is substantial evidence to support the BIA's decision denying CAT protection.

Pursuant to Article 3 of the CAT, the United States has an obligation under international law not to "expel, return (refouler) or extradite a person" to a country "where there are substantial grounds for believing that he [or she] would be in danger of being subjected to torture." CAT Art. 3, § 1. An applicant seeking relief must show two things. First, that he or she is "more likely than not" to be tortured if removed to a particular country. 8 C.F.R. § 208.16(c)(2). Second, the torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity

---

[3] While Gomez-Abrego argues that the "legal standard" as to the definition of torture was misapplied, it appears what she means is that the BIA could have come to a different conclusion on the facts based on the definition of torture. As we mentioned above, we review for substantial evidence.

or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). There must be a nexus between these two elements.

Gomez-Abrego maintains that there was sufficient evidence in front of the BIA to show a probability of torture and government involvement therein and acquiescence thereof. On the other hand the government argues that Gomez-Abrego failed to establish that it was more likely than not that she would be tortured with the acquiescence of a public official or person acting in an official capacity. The record does not compel a finding contrary to the decision reached by the BIA. Gomez-Abrego fails to point out any specific evidence on the record beyond her belief that the police were "in cahoots" with gang members and the country report showing widespread violence and police corruption in El Salvador that would compel a result different from that of the BIA. Put simply, Gomez-Abrego reiterates arguments made in front of the BIA, but fails to explain how the BIA got it wrong. She does not provide -- in her brief to this court or elsewhere -- any evidence establishing that she was harmed by police or any government official, or any probability that she would be tortured if she is returned to El Salvador by or with the consent or acquiescence of a government official. Accordingly, the decision of the BIA was supported by substantial evidence. See Lopez de Hincapie v. Gonzales, 494 F.3d 213, 221 (1st Cir. 2007) (considering country condition evidence reflecting violence and

corruption, but ultimately finding that "the petitioner has not adduced any evidence that the prospective torturers were state actors or alternatively, that the authorities would be in some way complicit (or, at least, acquiescent) in the torture. This is important because the infliction of harm does not constitute torture within the meaning of the CAT unless that harm is inflicted by, at the direction of, or with the acquiescence of government officials." (footnote omitted)).

Gomez-Abrego makes a secondary argument involving the CAT for the first time in her briefing to this court. She argues that the regulations that implement the CAT, promulgated by the Department of Justice at 8 C.F.R. § 1208.18, are *ultra vires* because they depart from the language of the CAT as ratified by the Senate, and therefore the BIA did not make a proper inquiry into whether there was government acquiescence for the purpose of her CAT claim.

The regulations Gomez-Abrego refers to are the Foreign Affairs Reform and Restructuring Act ("FARRA"), Pub. L. No. 105-277, § 2242(b), 112 Stat. 2681-822 (codified as a note to 8 U.S.C. § 1231), which instructed agencies to implement the obligations of the United States under Article 3 of the Convention. While we could get into the nitty-gritty of the CAT regulations, we need not do so here. Since Petitioner failed to bring this argument to the BIA in the first instance, it has not been exhausted, and we

- 15 -

are without jurisdiction to review it.  See Makhoul v. Ashcroft, 387 F.3d 75, 80 (1st Cir. 2004) ("[T]heories not advanced before the BIA may not be surfaced for the first time in a petition for judicial review of the BIA's final order.")

*Petitioner's 28(j) Letter*

Gomez-Abrego filed a letter pursuant to Fed. R. App. Proc. 28(j) submitting a notice of supplemental authority highlighting the Supreme Court's April 29, 2021 decision in Niz-Chavez v. Garland, 141 S. Ct. at 1474.  In this letter, Petitioner argues that the Supreme Court again held, as it did in Pereira v. Sessions, 138 S. Ct. 2105, 2113-14 (2018), that 8 U.S.C. § 1229(a)(1) requires that an NTA must contain all of the information required (including the time and place of the hearing) on a single document, streamlining the holding of Pereira to conclude that documents served *seriatum* over time would not trigger the Illegal Immigration Reform and Immigrant Responsibility Act's stop-time rule (a rule not at issue in this case).  Petitioner argues that as a result of Niz-Chavez, a defective NTA (i.e. one without the date and time to appear), such as her own, "fails to confer jurisdiction on the receiving Immigration Court."

This court need not delve into the merits of Petitioner's challenge because we are without jurisdiction to review this question.  Before the IJ, Gomez-Abrego indeed attempted to make this same argument based on Pereira, but her motion was denied and

- 16 -

the IJ specifically noted that the argument was preserved for appeal. But Petitioner did not raise this issue to the BIA. See Ahmed, 611 F.3d at 97 (stating that "[i]t is settled beyond hope of contradiction that judicial review of a final order of the BIA may proceed only if, and to the extent that, the alien has exhausted all administrative remedies available to the alien as of right" (quotation marks omitted)). "Faithful to this rule, we consistently have held that arguments not made before the BIA may not make their debut in a petition for judicial review of the BIA's final order." Id. Consequently, this court lacks jurisdiction to hear this unexhausted claim.

## CONCLUSION

For the foregoing reasons, we **deny** in part the petition for judicial review, and **remand** to the BIA for further consideration in accordance with the court's decision.